UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHAWNA WELLS,<br><br>          Plaintiff,<br><br>      v.<br><br>SKYNET DIGITAL, LLC, an Idaho limited liability company, d/b/a MEDICAL SPECIALTIES OF IDAHO; AARON J. ALTENBURG, M.D., individually; and AARON J. ALTENBURG, M.D., P.C., an Idaho Professional Corporation,<br><br>          Defendants. | Case No. 4:14-cv-00450-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a Motion for Summary Judgment filed by Defendants Aaron J. Altenburg, M.D., and Aaron J. Altenburg, M.D., P.C. (Dkt. 32), and a Motion to Strike filed by Plaintiff Shawna Wells (Dkt. 34). The Court will address each motion below.

## BACKGROUND

Shawna Wells started working as Dr. Aaron Altenburg's medical assistant in 2008. *Wells Aff.* ¶ 2, Dkt. 33-19. In 2012, Dr. Altenburg contracted with Skynet Digital,

LLC (Skynet) for office space and staffing services. *Def. SOF* ¶ 5, Dkt. 32-1. That contract entitled Skynet to 8% of Dr. Altenburg's collections. *Pl. SOF* ¶ 6, Dkt. 33-1. Though Dr. Altenburg's contract with Skynet precluded him from controlling Skynet's office space and staffing services it provided under the contract, he requested that Wells remain his medical assistant and that any benefit waiting periods for her be waived. *Id.* ¶ 2. Skynet agreed to Dr. Altenburg's request and hired Wells while also waiving her benefit waiting periods. *Id.* ¶ 3.

Wells worked almost exclusively with Dr. Altenburg at Skynet. Dr. Altenburg called Wells his "office wife," explaining that when Wells was away, "[i]t doesn't flow as efficiently as when she's there." *Altenburg Depo.* 73:7-8, Dkt. 33-4. Given their close working relationship, Wells recalls that Dr. Altenburg promised her she would "have a job with [him] as long as she want[ed] it." *Wells Depo.* 79:18-20, Dkt. 33-11.

In December 2013, Dr. Altenburg initiated a separation proceeding against Tammy Chavarria. *Pl. SOF* ¶ 9, Dkt. 33-1. A key issue in the separation proceeding was whether the two were actually married. *Id.* ¶ 10. Dr. Altenburg contended they were not married, while Chavarria argued they were married by virtue of common law. *Id.* Dr. Altenburg asked Wells to testify in the separation proceeding. *Id.* ¶ 11. Wells, who had become friends with both Dr. Altenburg and Chavarria, agreed to testify. *Id.* ¶¶ 9, 11. But, in January 2014, when Wells told Dr. Altenburg's attorney how Dr. Altenburg had called Chavarria his wife several times, Dr. Altenburg's attorney responded that, "Well, we can't use that!" *Id.* ¶ 11.

In January 2014, Wells grew concerned that Dr. Altenburg's separation proceeding was beginning to compromise his work performance. *Id.* ¶ 12. She specifically noticed that Dr. Altenburg "was not spending time with his patients, cancelled appointments at the last minute, and had lost his focus on patient care." *Wells Aff.* ¶ 17, Dkt. 33-19. These concerns, in turn, exacerbated Wells's pre-existing depression and anxiety. *Pl. SOF* ¶ 12, Dkt. 33-1.

Wells discussed her concerns and symptoms with Dr. Altenburg in or around March 2014. *Id.* ¶ 13. He indicated he would try to refocus his priorities, but Wells alleges his performance never improved. *Id.* In fact, after discussing her concerns with Dr. Altenburg, Wells claims he stopped communicating with her unless absolutely necessary, "making it incredibly difficult for Wells to do her job and causing Wells' pre-existing depression and anxiety to further escalate, causing Wells problems with sleeping and working." *Id.* ¶ 14. On several occasions in March 2014, Wells also discussed her concerns and symptoms with Amy Parslow, Skynet's manager, and Lori Kitzmiller, Wells's immediate supervisor. *Id.* ¶¶ 17-18. Wells told them that her depression and anxiety "had gotten so bad that she had been suicidal." *Id.* ¶ 17. At Parslow's request, Wells documented her concerns to be placed in her employee file. *Id.* ¶ 18.

On April 1, 2014, Parslow removed Wells from her normal workstation and assigned her to work at a reception desk. *Wells Aff.* ¶¶ 24, 26, Dkt. 33-19. Parslow explained Wells had been moved because Dr. Altenburg wanted to enhance efficiency by improving the "flow" of his clinic. *Def. SOF* ¶ 28, Dkt. 32-1. According to Wells,

however, working at the reception desk made her job "nearly impossible." *Pl. SOF* ¶ 22, Dkt. 33-1. Due to patient privacy concerns, Wells "could not return patient phone calls . . . [or] call in prescriptions" from the reception desk. *Wells Aff.* ¶ 28, Dkt. 33-19. She "had no access to [her] faxes or a fax machine." *Id.* And she "did not feel comfortable setting up surgeries because of the detailed information that was necessary from the patient, and [she] could not get surgery packets put together." *Id.* Faced with these difficulties, Wells struggled through her first two days at the reception desk, crying off and on. *Id.* ¶¶ 25-29. Thus, the move to the reception desk, along with Dr. Altenburg's now distant demeanor, caused Wells's depression and anxiety to "skyrocket." *Pl. SOF* ¶ 23, Dkt. 33-1.

Wells highlights two events that occurred on April 4, 2014. First, Wells alleges Dr. Altenburg met with Parslow to recommend Wells be terminated. *Id.* ¶ 26. Jamie Campion, whose workstation sat close to Parslow's office, testified that Dr. Altenburg and Parslow had an uncommonly long meeting that day, after which Dr. Altenburg asked, "So, is that thing we talked about going to be taken care of?" *Campion Aff.* ¶ 7, Dkt. 33-20. When Parslow indicated "Yes," Dr. Altenburg requested he be notified when "that thing" was done. *Id.* Campion understood Parslow and Altenburg were planning Wells's termination. *Id.* ¶ 8. Also on April 4, 2014, Wells executed an affidavit for Chavarria in the separation proceeding. *Pl.* SOF ¶ 29, Dkt. 33-1. In the affidavit, she testified that Dr. Altenburg had introduced Chavarria as his wife during social events Wells had attended. *Id.*

On Monday, April 7, 2014, Chavarria filed Wells's affidavit. *Id.* That same day, Parslow terminated Wells, explaining that "[d]ue to problems with you and Dr. Altenburg, we can no longer have you work here." *Id.* ¶ 30. Dr. Altenburg maintains he was unaware that Parslow planned to terminate Wells. *Def. SOF* ¶ 27, Dkt. 32-1. Wells disputes that fact and brings claims against Aaron J. Altenburg, M.D., and Aaron J. Altenburg, M.D., P.C. (collectively Defendants) for (1) disability discrimination under the Americans with Disabilities Act (ADA) and the Idaho Human Rights Act (IHRA); (2) retaliation under the ADA and IHRA; (3) wrongful termination in violation of public policy; and (4) intentional interference with economic expectancy. Defendants now move for summary judgment on all claims.

## LEGAL STANDARD

A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is "not a disfavored procedural shortcut," but instead is the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The Court must view the evidence in the light most favorable to the non-moving party and must not make credibility findings. *Id.* at 255. However, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence, like affidavits or deposition excerpts, but may simply point out the absence of evidence to support the non-moving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). The burden then shifts to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. This requires the non-moving party to go beyond the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

## DISCUSSION

**1.      Wells's Claims under the ADA and IHRA**

   **A.      Coverage of the ADA**

Defendants first argue Wells cannot bring ADA claims because Defendants are not "employers" under the ADA.[1] The ADA defines "employer" according to its definition under Title VII of the Civil Rights Act of 1964: "a person engaged in an industry affecting commerce who has fifteen or more employees . . . ." 42 U.S.C. § 2000e(b); 42 U.S.C. § 12111(5)(A). Thus, to establish the ADA governs Defendants, Wells must show Defendants were a single or joint employer with Skynet.

   **(1)      Single Employer Test**

The Ninth Circuit "treats two entities as one if they have (1) interrelated operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control." *Morgan v. Safeway Stores, Inc.*, 884 F.2d 1211, 1213 (9th Cir. 1989). "None of these factors are dispositive, and all four need not be met in each case." *Thompson v. C & H Sugar Co.*, 2014 WL 1266804, at *9 (N.D. Cal. Mar. 24, 2014) (citing *N.L.R.B. v. Triumph Curing Ctr.*, 571 F.2d 462, 468 (9th Cir.1978)).

---

[1] That the IHRA governs Defendants appears undisputed. The IHRA defines "employer" as "a person, wherever situated, who hires five (5) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year whose services are to be partially or wholly performed in the state of Idaho . . . ." Idaho Code § 67-5902(6). Wells notes that Defendants employed seven staff members. *Pl. Opp. Br.* at p. 6, fn. 3, Dkt. 33. Since Defendants have not disputed that fact, the Court will treat Defendants as an employer under the IHRA.

Questions of fact surround whether Defendants and Skynet constitute a single employer. First, Defendants and Skynet had interrelated operations. Skynet provided Defendants with office space and staff, including "an administrator, clinic manager, nurse, medical assistant, reception and billing personnel." *Pl. SOF* ¶ 7, Dkt. 33-1. Second, Defendants and Skynet shared common management, with Parslow managing Defendants and Skynet. *Id.* ¶ 6. Third, a reasonable jury could find centralized control of labor relations. For instance, Dr. Altenburg "insisted not only that [Wells] be hired by Skynet . . . but also that any waiting periods for benefits be waived for Wells," and Skynet agreed. *Id.* ¶ 2. He further told Wells she would "have a job with [him] as long as she want[ed] it." *Wells Depo.* 79:18-20, Dkt. 33-11. Fourth, a reasonable jury could also find common ownership or financial control. Wells argues Dr. Altenburg had "substantial control over Skynet." *Pl. SOF* ¶ 6, Dkt. 33-1. She points to his lease and staffing services agreement with Skynet, which entitled Skynet to "8% of Altenburg's collections." *Id.* Thus, a reasonable jury could find Defendants had at least some financial control over Skynet. In sum, the Court concludes that there are disputed issues of material fact as to whether Defendants and Skynet meet the single employer test.

### (2) Joint Employer Test

The Ninth Circuit treats two or more employers as a joint employer "if both employers control the terms and conditions of employment of the employee." *E.E.O.C. v. Pac. Mar. Ass'n*, 351 F.3d 1270, 1275 (9th Cir. 2003). The joint employer test considers "all factors relevant to the particular situation." *Id.* Those factors include the employers'

(1) nature and degree of control of the employee; (2) degree of supervision, direct or indirect, of the employee's work; (3) power to determine the employee's pay rate or method of payment; and (4) right, directly or indirectly, to hire, fire, or modify the employee's working conditions. *Id.* (citation omitted).

Questions of fact also surround whether Defendants and Skynet constitute a joint employer. First, as to the nature and degree of control, Skynet agreed to Dr. Altenburg's request for Skynet to hire Wells and waive any waiting periods for benefits. *Pl. SOF* ¶ 3, Dkt. 33-1. And, as noted, Dr. Altenburg told Wells she would "have a job with [him] as long as she want[ed] it." *Wells Depo.* 79:18-20, Dkt. 33-11. Second, Defendants supervised Wells's work. Defendants argue "Skynet's supervisory staff supervised Ms. Wells' work," not Defendants. *Def. Br.* at p. 7, Dkt. 32-2. But the fact remains that "Wells worked almost exclusively with and for Altenburg," and since Wells was "so integral" to Dr. Altenburg, "he referred to her as his 'office wife.'" *Pl. SOF* ¶ 3, Dkt. 33-1. Third, Defendants also had at least some control over Wells's compensation, as Dr. Altenburg was responsible for disbursing bonus payments. *Id.* ¶ 7. Fourth, Defendants were able to modify the terms and conditions of Wells's employment. For instance, when Dr. Altenburg wanted to change the flow of his clinic, Wells contends he arranged for Parslow to remove Wells from her normal work station and assign her to a reception desk. *Id.* ¶ 20. Again, the Court concludes there are disputed issues of material fact as to whether Defendants and Skynet meet the joint employer test.

    **B.**    **Disability Discrimination**

Defendants next argue Wells has no triable disability discrimination claim. A *prima facie* disability discrimination claim under the ADA and IHRA requires a plaintiff to establish that she (1) is disabled; (2) is qualified with or without reasonable accommodation to perform the essential functions of the job; and (3) suffered an adverse employment action because of her disability. *See Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1353 (9th Cir. 1996).

Defendants first argue Wells is not disabled. The ADA and IHRA define "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The impairment must "substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). The impairment, however, "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.*

Here, Wells claims she suffered from depression and anxiety that "substantially limited her ability to work, sleep, and function from a mental health perspective." *Pl. Opp. Br.* at p. 11, Dkt. 33. She explains that the symptoms generally emerged once a month, but that Dr. Altenburg exacerbated her symptoms by excluding her from work-related discussions after she reported concerns of his work performance. *Wells Aff.* ¶ 16, Dkt. 33-19. According to Wells, Dr. Altenburg caused her depression to become "so bad

that she [became] suicidal." *Pl. SOF* ¶ 17, Dkt. 33-1. Defendants counter that Wells's depression and anxiety did not substantially limit her ability to work, emphasizing Wells testimony that she was able to perform her work duties and had in fact "received positive feedback on her job performance." *Wells Depo.* 61:15-18; 69:8-15, Dkt. 32-5.

At this stage, Defendants' argument is unpersuasive for two reasons. First, that Wells was still able to perform her job satisfactorily does not resolve whether she was substantially limited in doing so. As Wells argues, she continued working even though she had suicidal thoughts. *Pl. SOF* ¶ 17, Dkt. 33-1. Second, Wells disputes whether her performance was actually satisfactory when her symptoms were most severe. She claims Dr. Altenburg became increasingly distant in or around March 2014 when her symptoms were most severe, which she felt indicated his dissatisfaction with her performance. *Wells Depo.* 69:16-25, Dkt. 33-11. Construing all facts in the light most favorable to Wells while recognizing that the definition of disability must be construed "in favor of broad coverage . . . to the maximum extent permitted by the" ADA, 42 U.S.C. § 12102(4)(A), Wells has raised genuine issues of material fact as to whether she is disabled.

Defendants next contend Wells did not suffer an adverse employment action because of her disability. Parslow testified she terminated Wells due to "personal issues going on" between Wells and Dr. Altenburg. *Parslow Depo.* 84:4-10, Dkt. 33-9. Parslow believed those issues concerned Wells having "befriended [Dr. Altenburg's] soon to be ex-wife and they were going through turmoil." *Id.* 84:16-18. Nevertheless, reasonable minds could differ as to whether Wells suffered an adverse employment action because

of her disability. Wells highlights how Parslow moved her to the reception desk just one week after reporting concerns of Dr. Altenburg's work performance and her worsening depression and anxiety. *Pl. SOF* ¶ 20, Dkt. 33-1. Wells explains how patient privacy requirements prevented her from performing many key tasks from the reception desk, making her job "almost impossible" and exacerbating her depression and anxiety. *Wells Aff.* ¶ 28, Dkt. 33-19. After one week at the reception desk, Wells was terminated. Based on the close timing of events, the Court finds Wells's allegations sufficient to raise a triable issue of fact as to whether she suffered an adverse employment action because of her disability.

Because Wells has raised genuine issues of material fact on her disability discrimination claim, the Court will deny Defendants summary judgment on this claim.

### C. Retaliation

A *prima facie* retaliation case under the ADA and IHRA requires a plaintiff to show that (1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the two. *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004). Once a *prima facie* case is established, the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions; the plaintiff must then demonstrate that the defendant's reason was pretextual. *Id.*

Summary judgment for Defendants on this claim is proper because Wells did not engage in a protected activity. Wells argues her reporting of concerns over Dr. Altenburg's work performance and reporting her depression and anxiety to Dr.

Altenburg, both constituted protected activities. Parslow, and Kitzmiller. *Pl. Opp. Br.* at p. 15, Dkt. 32. Wells's argument, however, does not demonstrate that she protested or opposed any conduct the ADA and IHRA prohibit. Thus, Wells's discussions about Dr. Altenburg's work performance and her depression and anxiety do not establish she engaged in protected activity. *Cf. Jenott v. St. Alphonsus Reg'l Med. Ctr.*, 2009 WL 5200524, at *4 (D. Idaho Dec. 23, 2009) (finding no protected activity where employee's reported concerns implicated violations of employer's leave policy and inadequate supervision, not unlawful discrimination). Consequently, the Court will grant Defendants summary judgment on this claim.

**2.      Wrongful Termination in Violation of Public Policy**

Defendants also seek summary judgment on Wells's claim for wrongful termination in violation of public policy. Generally, at-will employees may be terminated "at any time for any reason without creating liability." *Edmonson v. Shearer Lumber Prods.*, 75 P.3d 733, 737 (Idaho Sup. Ct. 2003). Nevertheless, if an employer fires an at-will employee for reasons that contravene public policy, the employer may be liable. *Bollinger v. Fall River Rural Elec. Co-op., Inc.*, 272 P.3d 1263, 1271 (Idaho Sup. Ct. 2012). The Idaho Supreme Court has repeatedly cautioned that this public-policy exception must be narrowly construed; otherwise, it could swallow the at-will rule. *Venable v. Internet Auto Rent & Sales, Inc.*, 329 P.3d 356, 361 (Idaho Sup. Ct. 2014) (quoting *McKay v. Ireland Bank*, 59 P.3d 990, 994 (Idaho Ct. App. 2002)). Thus, the Court acknowledges that "many activities and interests engaged in by employees benefit

the community," but "not all of them are recognized as falling within the public policy exception." *McKay*, 59 P.3d at 994.

Terminating an at-will employee contravenes public policy only if the "employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act; (2) performing an important public obligation; or (3) exercising certain legal rights or privileges." *Id.* Deciding if a public policy is sufficient to protect an at-will employee from termination is a question of law. *Van v. Portneuf Med. Ctr.*, 212 P.3d 982, 991 (Idaho Sup. Ct. 2009). "In order to properly state a claim under the public policy exception, a plaintiff must specifically identify the public policy in question and then provide evidence to show a violation of the public policy." *Venable*, 329 P.3d at 362. A state's constitution, statutes, and case law generally dictate its public policy. *See Edmonson*, 75 P.3d at 737-38.

Here, Wells contends she was terminated for providing testimony or potential testimony in Dr. Altenburg's separation proceeding. *Pl. Opp. Br.* at pp. 16-17, Dkt. 33. This contention, taken as true, triggers a sufficient policy under Idaho law. *See Hummer v. Evans*, 923 P.2d 981, 280 (Idaho Sup. Ct. 1996) ("[T]here exists an overriding public policy interest in obtaining candid, truthful information for use in court proceedings."). Wells executed an affidavit for Chavarria on April 4, 2014. *Pl.* SOF ¶ 29, Dkt. 33-1. That affidavit was then filed on April 7, 2014—the same day Wells was terminated. *Id.* Defendants argue neither they nor Skynet had any knowledge of Wells's testimony when she was terminated. *Def. SOF* ¶¶ 24-29, Dkt. 32-1. Even so, Wells informed Dr.

Altenburg's attorney in January 2014 that she would testify he had called Chavarria his wife several times. *Pl.* SOF ¶ 11, Dkt. 33-1. After that discussion, Wells's and Dr. Altenburg's relationship began to crumble. Thus, even if neither Defendants nor Skynet knew of Wells's affidavit when she was terminated, questions of fact still exist as to whether she was terminated for indicating she would be willing to provide truthful testimony. Accordingly, the Court will deny Defendants summary judgment on this claim.

### 3. Intentional Interference with Economic Expectancy

Finally, Defendants seek summary judgment on Wells's intentional interference with economic expectancy claim. She brings this claim in the alternative, acknowledging that "[i]f Altenburg is found to have an employment relationship with Wells, this claim would be moot." *Pl. Opp. Br.* at p. 17, fn. 7, Dkt. 33. Because no final legal determination has been made as to an employment relationship, the Court will address this claim.

Intentional interference with economic expectancy requires a plaintiff to show: "(1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted." *Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1081 (Idaho Sup. Ct. 2010) (citation omitted).

**MEMORANDUM DECISION AND ORDER - 15**

Defendants challenge only the third and fourth elements. The third element requires that the tortfeasor "desire[] to bring it about or . . . know[] that the interference is certain or substantially certain to occur as a result of his action." *Highland Enters., Inc. v. Barker*, 340, 986 P.2d 996, 1006 (Idaho Sup. Ct. 1999). The fourth element requires that the tortfeasor either: "(1) had an improper objective or purpose to harm the plaintiff"; or (2) "used a wrongful means to cause injury to the prospective business relationship." *Ernest*, 243 P.3d at 1081. Wells argues Defendants arranged for her placement at the reception desk, intending "to force [her] to resign" by making her job "almost impossible." *Wells Aff.* ¶¶ 28-29, Dkt. 33-19. She further claims she was moved to the reception desk because Defendants sought to "punish her because [Dr. Altenburg] was upset with Wells for telling both him and her Skynet supervisors that his practice was suffering, that her depression and anxiety were aggravated by his conduct, and because she would not provide the testimony he wanted in his divorce case." *Pl. Opp. Br.* at p. 18, Dkt. 33. In contrast, Defendants contend Wells was moved to the reception desk because Dr. Altenburg wanted to enhance efficiency and improve the flow of his clinic, not to interfere with Wells's employment or otherwise punish her. *Def. SOF* ¶ 28, Dkt. 32-1. Wells, however, rebuts that no other medical assistant, including her replacement, was required to work at the reception desk. *Pl. SOF* ¶ 20, Dkt. 33-1. At this stage, construing all facts in the light most favorable to Wells, her allegations are sufficient to raise a triable issue of fact on this claim. The Court will therefore deny Defendants summary judgment on this claim.

**4.     Motion to Strike**

Wells seeks to strike portions of Dr. Altenburg's declaration. The Court did not rely on Dr. Altenburg's declaration in any way and, therefore, will deny Wells's Motion to Strike as moot.

## ORDER

1.     Defendants' Motion for Summary Judgment (Dkt. 32) is **GRANTED in part,** and **DENIED in part.** The motion is granted as to Wells's claim for retaliation under the ADA and IHRA. The motion is denied as to Wells's remaining claims.

2.     Plaintiff's Motion to Strike (Dkt. 34) is **MOOT.**

DATED: May 11, 2016

_____
B. Lynn Winmill
Chief Judge
United States District Court